IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

LEE HENDELSON, Individually and as )
Personal Representative for the Estate )
of ADAM HENDELSON; )
)                    CASE NO. _____
PLAINTIFFS. )
)                    **05 - 81116**
vs )
)                    JURY DEMANDED
JOHNSON & JOHNSON COMPANY; )             CIV-MIDDLEBROOKS
JANSSEN PHARMACEUTICA PRODUCTS, LP; & )
ALZA CORPORATION )
)                    MAGISTRATE JUDGE
DEFENDANTS. )                    JOHNSON

COMES NOW, Plaintiff, LEE HENDELSON, individually and as Personal
Representative for the Estate of ADAM HENDELSON (hereinafter "Plaintiff"), in the above
entitled action and file this Complaint against Defendants states as follows:

### STATEMENT OF PARTIES

1.  Plaintiff, LEE HENDELSON, being sui juris and, at all relevant times, a resident of West
    Palm Beach located in Palm Beach County, Florida, brings this action on behalf of the
    Estate of ADAM HENDELSON, deceased, pursuant to valid Letters of Administration
    issued on December 8, 2005 by the Probate Court in and for Palm Beach County, Florida.
    Plaintiff, LEE HENDELSON, further brings this action individually on behalf of himself
    as the father and parent of his deceased son ADAM HENDELSON for damages
    including mental pain and suffering.

2.  Defendant, JOHNSON & JOHNSON COMPANY (hereinafter "Johnson & Johnson") is
    a foreign corporation existing and doing business pursuant to the laws of the state of New

Jersey and with its principal place of business in New Jersey.  At all times material and relevant, JOHNSON & JOHNSON did business in the state of Florida.

3.      Defendant, JANSSEN PHARMACEUTICA, LP (hereinafter "Janssen") is a foreign corporation and a subsidiary of Defendant, JOHNSON & JOHNSON existing and doing business pursuant to the laws of the state of New Jersey with its principal place of business in the state of NEW JERSEY.  At all times material and relevant, JANSSEN did business in the state of Florida.

4.      Defendant, ALZA CORPORATION (hereinafter "Alza") is a foreign corporation existing and doing business pursuant to the laws of the state of Delaware with its principal place of business in the state of California.  At all times material and relevant, ALZA did business in the state of Florida.

5.      At all times material to this lawsuit, each of the Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, advertising, distributing and/or selling the prescription drug product known as the Duragesic patch as a pain medication to the general public including Plaintiff's decedent Adam Hendelson

6.      At all times material to this lawsuit, each of the Defendants were authorized to do business within the state of Florida and did in fact supply Duragesic patches within the state of Florida.

2

## JURISDICTION AND VENUE

7.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332. All parties to this action are of diverse citizenship. The amount in controversy exceeds $75,000 exclusive of interests and costs.

8.    Venue is proper in this Court. The death of Plaintiff's decedent occurred in the State of Florida within this judicial district and many of the acts and/or occurrences giving rise to the death of Plaintiff's decedent occurred in the state of Florida within this judicial district.

## FACTUAL ALLEGATIONS

9.    Duragesic is the registered name for a trans-dermal patch that is available only by prescription. This patch contains a gel form of fentanyl, an opioid that is up to one hundred times stronger than morphine.

10.   The Duragesic patch is applied directly to the skin of the user, and is designed to deliver fentanyl medication at a regulated rate for up to seventy-two (72) hours. This product is designed to relieve chronic moderate to severe pain such as that suffered by Adam Hendelson.

11.   At all relevant times, Johnson & Johnson was in the business of designing, licensing, promoting, manufacturing, marketing, selling and distributing pharmaceuticals and other products, including Duragesic patches.

12.   Johnson & Johnson is licensed to do business and in fact does business by agent in the state of Florida. At all relevant times, Johnson & Johnson designed, developed, licensed, marketed, manufactured, sold and placed in the stream of commerce Duragesic patches, including the patch at issue in this lawsuit. Johnson & Johnson did this throughout the United States and in the state of Florida.

3

13.     At all relevant times, Johnson & Johnson acted in conjunction with other affiliated, related, jointly owned or controlled entities or subsidiaries, including Defendant Janssen and Defendant ALZA.

14.     At all relevant times, Janssen was in the business of designing, licensing, promoting, manufacturing, marketing, selling and distributing pharmaceuticals and other products, including Duragesic patches.  At all relevant times, Janssen designed, developed, licensed, marketed, manufactured, sold and placed in the stream of commerce Duragesic patches, including the patch at issue in this lawsuit.  Janssen did this throughout the United States and in the state of Florida.

15.     At all relevant times, Janssen acted in conjunction with other affiliated, related, jointly owned or controlling entities, including Defendant Johnson & Johnson and Defendant ALZA Corporation.

16.     At all relevant times, ALZA was in the business of designing, licensing, promoting, manufacturing, marketing, selling and distributing pharmaceuticals and other products, including drug delivery systems such as the one used on the Duragesic patch at issue in this lawsuit.  ALZA did this throughout the United States and in the state of Florida.

17.     At all relevant times, ALZA was affiliated with Johnson & Johnson and Janssen, through merger, joint venture, joint or common ownership or otherwise, and in conjunction and in combination with Johnson & Johnson and Janssen designed, licensed, promoted, manufactured, marketed, distributed, sold and placed in the stream of commerce Duragesic patches, including the patch at issue in this lawsuit.

18.     The Duragesic patch in question was designed, manufactured, distributed, sold and placed in the stream of commerce by Johnson & Johnson, Janssen and ALZA. The Defendants designed and manufactured these patches using a patented drug delivery method developed by ALZA.  In this drug delivery system, the opioid drug fentanyl is

4

placed inside the patch. The patch is designed to be placed on the skin of the user. In theory, the drug is then introduced to the user at a controlled rate over a period of time.

19. On or about December 16, 2003, Adam Hendelson used a 75-microgram Duragesic transdermal patch that had been prescribed for him by a physician licensed in the state of Florida and he used it as prescribed. Said patch was manufactured, sold, distributed and placed in the stream of commerce by the Defendants, Johnson & Johnson, Janssen and ALZA.

20. At the time the patch was applied, Adam Hendelson did not know, and could not have known, that this Duragesic patch was defective and would cause injury and death.

21. Adam Hendelson did not know, and could not have known, that prior to the date he used the Duragesic patch referred to above, that the Defendants were aware and had knowledge that certain of the Duragesic patches manufactured, marketed, sold and distributed were defective and had the propensity to cause severe injury including death.

22. In fact, Defendants knew as early as October 2001, that their manufacturing processes were flawed and that prior to February 20, 2004, their in-process and quality control checks for the Duragesic patch were inadequate to prevent the release and distribution of defective product. Types of defects exhibited in the Duragesic product included: fold-overs in the backing of the patch system; gel in the seal; seal breaches; corners of the patch system cut off; holes in the drug reservoir; slits in the patch's pouch and system; air bubbles in the adhesive layers of the system; no gel in the system; and, lack of adhesion in the patch system.

23. On February 16, 2004, Defendants provided notice that there was a defect in one lot of Duragesic 75 mcg/hour patches, being lot number 0327192. Subsequently, the Food and Drug Administration ("FDA") issued a Class I recall, meaning there was a serious health risk, for this lot of 75 mcg/hour Duragesic patches. The recall was deemed necessary, as there was the potential for the opioid medication contained in these patches to leak

causing overdose and subsequent injury, including death to the user. The Defendants advised the FDA that exposure to a defective patch could cause an increased drug effect, including nausea, sedation, drowsiness, respiratory depression or other life threatening conditions. The February recall only related to patches with control number 0327192, as that was the only lot the Defendants advised the FDA was defective.

24. Despite knowing of this defect prior to the date Adam Hendelson used the patch in question, the Defendants took inadequate steps to advise physicians, hospitals, nursing homes and other health care providers of the possibility of defects occurring in other patches and of the significant danger to users of the Duragesic patches.

25. Despite having actual notice of this defect prior to the date Adam Hendelson used the patch in question, the Defendants took inadequate steps to advise consumers, including Adam Hendelson of this defect, the risk posed by similar defects and the significant dangers presented to those using a defective Duragesic patch. The Defendants also failed to take adequate steps to ensure that other lots that they had manufactured were safe for the public and would function in the manner in which they were intended.

26. It was not until April 2, 2004, that the Defendants advised physicians by letter that additional lots of Duragesic 75 mcg/hour patches were defective and posed a risk to anyone using them.

27. The additional lots the Defendants stated could contain defective Duragesic patches were lots numbers 0327193, 0327294, 0327295, and 0330362.

28. The Duragesic patch used by Adam Hendelson on or about December 16, 2003, was defective in that it exposed him to an excessive and deadly amount of fentanyl. As a result of using said Duragesic patches, Adam Hendelson received an overdose of the opioid fentanyl and died as a direct and proximate result. In an FDA inspection report dated June 16, 2004, in which the FDA criticized Defendants' manufacturing and stated the following:

6

> Although the fold over defect is the most serious manufacturing defect that the Duragesic product has exhibited, the product also has a problem with the gel in the seal and small amounts of gel leaking. The firm has termed these defects as classic "stringer leakers" and they occur on both the [redacted] and the [redacted], but is more prominent on all dosage strengths (50, 75, and 100µg) produced on the [redacted]. This appears to be due to the dosing head design and the motion of the dosing heads as the [redacted] dosing heads trail while dosing and the [redacted] dosing heads drop up and down. The firm is in the process of purchasing new dosing heads for the [redacted].

Department of Health and Human Services Food and Drug Administration, Investigation Report of Jeffrey M. Watson, Investigator, dated June 16, 2004, pp.6-7, 12. This report further makes clear that the manufacturing process and materials utilized to produce the Duragesic patch are consistent regardless of the size of the patch.

29.    Even after being made aware of the numerous defects including those which triggered the recalls, Defendants still failed to take all reasonable and necessary steps to insure that their manufacturing and quality control processes were adequate. As stated in the aforementioned FDA Report, Defendants knew that "classic leakers" in Duragesic patches were a continuing problem and stated to FDA that they were evaluating an upgrade to their manufacturing and inspection processes but that "it's not a high on the priority list." Department of Health and Human Services Food and Drug Administration, Investigation Report of Jeffrey M. Watson, Investigator, dated June 16, 2004, p. 41. Other recommended steps to reduce the number of patches exhibiting leaks were considered to be "not feasible due to engineering issues and costs." Id. at 41.

30.    In June of 2005, over a year after the death of Adam Hendelson, the Defendants issued new and more detailed warnings regarding the use of the Duragesic patch.

31.   On July 15, 2005, after receiving reports of a number of deaths associated with use of Duragesic patches, the Food and Drug Administration (the "FDA") issued a Public Health Advisory regarding "Safety Warnings Regarding Use of Fentanyl Transdermal (Skin) Patches." That warning was issued because "FDA is investigating reports of death and other serious side effects from overdoses of fentanyl in patients using fentanyl transdermal (skin) patches for pain control." The warning can be found on the official FDA website at http://www.fda.gov/cder/drug/advisory/fentanyl.htm.

32.   Defendants Johnson & Johnson, Janssen and ALZA acted jointly and/or as each others' agents, within the course and scope of the agency, with respect to the conduct alleged in this amended complaint.

33.   Plaintiff alleges that Johnson & Johnson, Janssen and ALZA were each aware of the defects in the Duragesic patches referred to herein, that they knew the risks and dangers such defects posed to those using the patches, and these Defendants aided, abetted, ratified, authorized, and acted in concert in the wrongful conduct set forth herein.

34.   There exists, and at all relevant times therein existed, a unity of interest and ownership between Johnson & Johnson, Janssen and ALZA with regard to the manufacture, marketing, sale and distribution of the Duragesic patches in question, and with regard to other related conduct, such that any individuality and separateness between these Defendants has ceased and these Defendants have become the alter-ego of one another.

35.   The Defendants have widely promoted the use of Duragesic patches as a safe and effective method of dealing with chronic and severe pain. This included representations about the safeness and effectiveness of using the transdermal delivery method.

36.    Due to the efforts of the Defendants, sales of Duragesic patches rose to approximately one and a half billion ($1,500,000,000.00) dollars annually.

37.    In addition to the numerous steps they have taken to increase sales of Duragesic patches, Defendants have also fought to extend their patent rights and to keep other companies from entering in to this lucrative area.  For example, certain of the Defendants sued Mylan Laboratories, Inc. asserting that Mylan's generic version of a transdermal patch to deliver fentanyl violated the Defendants' patents.  Certain of the Defendants also sought, and obtained, a six-month extension of the marketing exclusivity for Duragesic patches. This exclusivity had been scheduled to end in July, 2004.

38.    As a result of Defendants' efforts and actions, the sales of Duragesic patches have become an enormous source of profits for these Defendants, their affiliates, and other related entities involved in the manufacturing and distribution of this product. Accordingly, the Defendants, individually and/or collectively, had a significant financial incentive to suppress, misrepresent and/or conceal any potential dangers or risks associated with Duragesic patches.

39.    Plaintiff asserts that Johnson & Johnson, Janssen and ALZA acted for the purpose of maximizing profits at the expense of the health of Adam Hendelson, and the health of others using Duragesic patches.  Plaintiff further asserts that these Defendants had actual or constructive knowledge that certain of the patches they produced could be defective, creating a significant danger to anyone who used the patches, yet failed to take adequate or timely actions to prevent the deaths of users of the defective patches or to warn the public of these dangers.

40.     Johnson & Johnson, Janssen and ALZA acted together, with a common profit motive, in failing to adequately or appropriately disclose material information relating to the defects in these Duragesic patches.   As a result, users of these patches, including Adam Hendelson, were unaware of the defects in these Duragesic patches, did not have adequate information to know the warnings signs of being exposed to an excessive amount of fentanyl, were unable to recognize the defect in the Duragesic patches and were therefore unable to avoid injury caused by using this defective drug product.

41.     As a direct and proximate result of Defendants' acts and omissions, Adam Hendelson died.   Defendants' are liable to both the Estate of Adam Hendelson for damages including those available pursuant to Section 768.21, Florida Statutes and Plaintiff Lee Hendelson individually for damages including Lee Hendelson's mental pain and suffering which Lee Hendelson has suffered as a result of his son, Adam Hendelson's, death.

## COUNT ONE – STRICT LIABILITY
## DEFECTIVE DESIGN AND FAILURE TO WARN

42.     Plaintiff adopts and realleges the foregoing paragraphs of this complaint as if fully set forth herein.

43.     Defendants Johnson & Johnson, Janssen, and ALZA were, at all relevant times, engaged in the business of designing, creating, manufacturing, testing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce Duragesic patches, including the Duragesic patch at issue in this lawsuit (hereinafter "Duragesic patches" or "product").

10

44.    These Defendants designed, created, manufactured, tested, labeled, packaged, supplied, marketed, sold, advertised, warned and otherwise distributed and placed in the stream of commerce the Duragesic patches at issue in this lawsuit. Adam Hendelson purchased and/or otherwise properly acquired said patches.

45.    Said Duragesic patches reached Adam Hendelson, the ultimate user and consumer of this product, without any substantial change in its condition from the time it was manufactured and/or sold by these Defendants.

46.    Said Duragesic patches, when they reached Adam Hendelson, were in a defective condition and/or were in a condition that was unreasonably dangerous to the ultimate user or consumer.  Said patches were dangerous to an extent beyond that which would be contemplated by the ordinary user or consumer who purchased it with the ordinary knowledge common to the community as to the product's characteristics.

47.    Adam Hendelson used said Duragesic patches, as they were designed and intended to be used, and died as a result.  Said death was the direct and proximate result of the product's defective and/or unreasonably dangerous condition.

48.    As a direct and proximate result of these Defendants' designing, creating, manufacturing, testing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce the Duragesic patches at issue in this lawsuit, Adam Hendelson was caused to die.

49.    The conduct of these Defendants, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of Adam Hendelson and the users and ultimate consumers of this product.

50.    The Defendants showed a reckless disregard for the public safety due to their acts and omissions as set forth in this Complaint. The Defendants knew, or should have known, that there was a substantial and unnecessary risk of injury and death to those who used their product and they failed to either determine the seriousness of the danger or reduce the risk to an acceptable minimal level.

51.    There was a serious risk of harm to the public that resulted from the defect in the Duragesic patches. The Defendants were aware of the existence and seriousness of the defects prior to the death of Adam Hendelson. The Defendants did not correct the defects, or take other steps to reduce the danger of injury, until it was too late. The amount it would have cost to correct the defect, or reduce the danger, was small compared to the risk the defect posed to consumers and users of the patches. The amount of profits that Defendants received from other sales of the defective patches was in the millions of dollars. The Defendants attempted to conceal the defect or deceive the public about the safety of the patches; and, the Defendants have very significant financial resources.

52.    At all times relevant herein, the Defendants manufactured, labeled, sold, distributed, supplied, dispensed, promoted and/or otherwise placing into the stream of commerce Duragesic patches which were defective, including one or more of the following particulars:

        a.    contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Adam Hendelson to risks which exceeded the benefits of the drug;

b.   delivered a lethal dose of fentanyl into the skin and circulatory system Adam Hendelson causing him to die;

c.   released its narcotic medication into Adam Hendelson's skin and circulatory system at a dangerous rate;

d.   released its narcotic medication into Adam Hendelson's skin and circulatory system at a rate faster than its advertised rate of 75 MCG/hr;

e.   the defective patches' protective liner and functional layers leaked and failed to deliver fentanyl from the drug reservoirs at the declared constant amount per unit of time of 75 MCG/hr;

f.   failed to provide adequate warning of the danger involved in the administration of this opioid analgesic;

g.   failed to warn of the symptoms of and steps to be taken for an overdose of this opioid analgesic;

h.   failed to warn against the use of this opioid analgesic without proper supervision and monitoring;

i.   the defective patches were defective in design and formulation, making use of the product more dangerous than the ordinary consumer would expect and more dangerous than other risks associated with like products;

j.   the defective patches contained insufficient and/or incorrect warnings to alert consumers and users of the risks of adverse effects;

k.   the defective patches were not safe for their intended use Duragesic patches were inadequately tested; and/or

l.    the defective patches were not accompanied by adequate instructions and/or warnings to fully apprise the prescribing physicians as well as the ultimate consumers, including Adam Hendelson, of the full nature or extent of the risks and side effects associated with its use.

53.    Defendants knew and intended that the Duragesic patches would be used by such consumers without any inspection for defects, and would rely upon the representations made by Defendants on the product label and otherwise.

54.    At the time of its manufacture and sale to Plaintiff, Duragesic patches were unsafe and defective to consumers using said product for its advertised purposes and in a reasonably foreseeable manner, in that it posed an unreasonably high risk of serious injury or death to consumers, which information was concealed by Defendants.

55.    Prior to the manufacturing, sale and distribution of Duragesic patches, Defendants knew, or were reckless in not knowing, that said Duragesic patches were in a defective condition.

56.    Adam Hendelson used the products for their intended purpose and could not have discovered any defect therein through the exercise of due care.

57.    Defendants, as manufacturer, marketer, distributor and seller of Duragesic patches and like products are held to the level of knowledge of an expert in its field.

58.    Adam Hendelson did not have substantially the same knowledge, as an adequate warning from Defendants should have communicated to him.

WHEREFORE, Plaintiff, Lee Hendelson, individually and as Personal Representative of the Estate of Adam Hendelson, demands judgment against

Defendants Johnson & Johnson, Janssen and ALZA for compensatory damages in an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

## COUNT TWO - NEGLIGENCE

59.   Plaintiff adopts and realleges the foregoing paragraphs of this complaint as if fully set forth herein.

60.   Defendants Johnson & Johnson, Janssen, and ALZA had a duty to exercise reasonable care in designing, creating, manufacturing, testing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce Duragesic patches, including the Duragesic patches at issue in this lawsuit.

61.   Defendants failed to exercise reasonable care in designing, creating, manufacturing, testing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce Duragesic patches, including the Duragesic patches at issue in this lawsuit.

62.   Defendants had a duty, once they learned of any potential problems with the Duragesic patches at issue in this lawsuit, to perform an adequate inquiry to determine the cause of the defect and to ensure that other patches were not manufactured or distributed with that same defect.

63.   Defendants had a duty, once they learned of any potential problems with the Duragesic patches at issue in this lawsuit, to adequately notify users and consumers and to promptly recall any defective, or potentially defective, patches.

64.  Defendants knew, or should have known, that the defective condition of the Duragesic patches at issue in this lawsuit created an unreasonable risk of bodily harm to anyone using said products.

65.  Despite the fact that these Defendants knew, or should have known, that the defective condition of the Duragesic patches at issue in this lawsuit could cause serious and life threatening injuries to anyone who used said patches, Defendants took inadequate steps to ensure that said products were safe, to ensure that additional defective patches were not manufactured or distributed, to notify consumers of this danger, to promptly recall said patches and/or to prevent said products from being used by persons such as Adam Hendelson.

66.  These Defendants knew, or should have known, that it was foreseeable that consumers, such as the Adam Hendelson, would suffer injuries as a result of these Defendants' failures to exercise ordinary care as set forth herein.

67.  The negligence of these Defendants was a contributing cause of the death of Adam Hendelson.

68.  The negligent conduct of these Defendants as set out in this Complaint was a direct and proximate cause of the death of Adam Hendelson.

69.  There was a serious risk of harm to the public that resulted from the defect in the Duragesic patches.  The Defendants were aware of the existence and seriousness of the defect.  Defendants did not correct the defect, or take other steps to reduce the danger of injury, until it was too late.  The amount it would have cost to correct the defect, or reduce the danger, was small compared to the risk the defect posed to consumers and users of the patches.  The amount of profits that

Defendants received from other sales of the defective patches was in the millions of dollars. The Defendants attempted to conceal the defect or deceive the public about the safety of the patches; and the Defendants have very significant financial resources.

WHEREFORE, Plaintiff, Lee Hendelson, individually and as Personal Representative of the Estate of Adam Hendelson, demands judgment against Defendants Johnson & Johnson, Janssen and ALZA for compensatory damages in an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

### COUNT THREE - BREACH OF EXPRESS WARRANTY

70.  Plaintiff adopts and realleges each of the foregoing paragraphs of this complaint as if fully set forth.

71.  Defendants Johnson & Johnson, and Janssen, ALZA expressly warranted that their Duragesic patches were safe.

72.  The Duragesic patches at issue in this lawsuit do not conform to that express representation because they leaked and were otherwise defective and delivered an improper dosage of the opioid they contained.

73.  As a result, they exposed users to a potentially life threatening dosage of the drug, fentanyl.

74.  The conduct of these Defendants as set forth herein was a direct, proximate and/or contributing cause of the death of Adam Hendelson.

WHEREFORE, Plaintiff, Lee Hendelson, individually and as Personal Representative of the Estate of Adam Hendelson, demands judgment against

Defendants Johnson & Johnson, Janssen and ALZA for compensatory damages in an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

## COUNT FOUR – BREACH OF IMPLIED WARRANTY

75. Plaintiff adopts and realleges the foregoing paragraphs of this complaint as if fully set forth herein.

76. At the time Johnson & Johnson, Janssen, and ALZA marketed, sold, or otherwise placed in the steam of commerce the Duragesic patches at issue in this lawsuit, said Defendants knew of the use for which Duragesic patches were intended and impliedly warranted said product to be of merchantable quality and to be safe and fit for its intended use.

77. Adam Hendelson reasonably relied on the skill and judgment of these Defendants as to whether said Duragesic patches were of merchantable quality and were safe and fit for its intended use.

78. Contrary to such implied warranty, the Duragesic patches at issue in this lawsuit were not of merchantable quality and were not safe or fit for its intended use, because said product was unreasonably dangerous and unfit for the ordinary purposes for which it was intended.

79. The conduct of these Defendants as set forth herein was a direct, proximate and/or contributing cause of the death of Adam Hendelson.

WHEREFORE, Plaintiff, Lee Hendelson, individually and as Personal Representative of the Estate of Adam Hendelson, demands judgment against Defendants Johnson & Johnson, Janssen and ALZA for compensatory damages in

an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

## COUNT FIVE - FRAUDULENT CONCEALMENT AND SUPPRESSION

80.   Plaintiff adopts and realleges each of the foregoing paragraphs of this complaint as if fully set forth herein.

81.   At the time Defendants Johnson & Johnson, Janssen, and ALZA marketed, sold, designed, created, manufactured, tested, labeled, packaged, supplied, advertised, warned and otherwise distributed and placed in the stream of commerce Duragesic patches, including the Duragesic patches at issue in this lawsuit, these Defendants knew of the use for which said patches were intended and impliedly and expressly warranted the product to be of merchantable quality and safe and fit for such its intended use.

82.   On information and belief, these Defendants intentionally, deliberately and wrongfully withheld relevant information relating to the defects in the Duragesic patches from health care providers and from the users of this product.

83.   On information and belief, these Defendants failed to advise Adam Hendelson and other users of the Duragesic patch in a timely manner of the defects in the Duragesic patches at issue.

84.   The conduct of these Defendants as set forth herein was a direct, proximate and/or contributing cause of the death of Adam Hendelson.

WHEREFORE, Plaintiff, Lee Hendelson, individually and as Personal Representative of the Estate of Adam Hendelson, demands judgment against Defendants Johnson & Johnson, Janssen and ALZA for compensatory damages in

an amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

## COUNT SIX - FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")

85. Plaintiff adopts and realleges each of the foregoing paragraphs of this complaint as if fully set forth herein.

86. Defendants' actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff to damages and relief under Fla. Stat. §§ 501.201-213.

87. Plaintiff's decedent was a consumer within the meaning of FDUTPA, who was deceptively and unlawfully induced to purchase and/or use of Defendants' Duragesic patches.

88. Florida Statutes, Section 501.204 makes unfair and/or deceptive trade practices in the conduct of any trade or commerce illegal.

89. Florida Statutes, Section 501.211 creates a private right of action for individuals who are aggrieved by an unfair and/or deceptive trade practice by another person.

90. Florida Statutes, Section 501.2105 provides that the prevailing party in litigation arising from a cause of action pursuant to Chapter 501 shall be entitled to recover attorney's fees within the limitations set forth therein from the non prevailing party.

91. Florida Statutes, Section 501.213 provides that any remedies available under Chapter 501 are in addition to any other remedies otherwise available for the same conduct under state or local law.

92. Florida Statutes, Section 501.203 (3)(c) states that a person has violated the Florida Deceptive and Unfair Trade Practices Act if he violates "any law, statute,

rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices."

93.     Defendants engaged in the practice of manufacturing, marketing, distributing, selling and otherwise placing into the stream of commerce Defendants' Duragesic patches which constitutes trade and commerce as defined by Sections 501.203(8) Fla. Stat., and is therefore subject to FDUPTA.

94.     Defendants' acts constitute unconscionable, deceptive, or unfair acts or practices in violation of FDUTPA.

95.     Upon information and belief, Defendants continue to act deceptively in its manufacturing, marketing, distributing, selling and otherwise placing into the stream of commerce Defendants' Duragesic patches, as alleged herein.

96.     As a result of Defendants' unfair and deceptive trade practices, decedent suffered significant personal injuries resulting in his death.

97.     As a result of Defendants' unfair and deceptive trade practices, Plaintiff is entitled to an award of attorney's fees pursuant to FDUTPA, Florida Statutes, Section 501.2105, if Plaintiff prevails.

        WHEREFORE, Plaintiff, Lee Hendelson, individually and as Personal Representative of the Estate of Adam Hendelson, demands judgment against Defendants Johnson & Johnson, Janssen and ALZA for compensatory damages in an amount to be determined by a jury including interest, costs and attorneys' fees, and demands trial by jury of all issues triable as of right by a jury.

## COUNT SEVEN - WRONGFUL DEATH

98.  Plaintiff adopts and realleges the foregoing paragraphs of this complaint as if fully set forth herein.

99.  At all times material hereto, Defendants owed a duty to Adam Hendelson to protect him against reasonably foreseeable harms which a prudent person would anticipate were likely to result from the Defendants' acts or omissions.

100.  Defendants breached that duty when they acted in the negligent and/or tortious manner set forth in Paragraphs above.

101.  Defendants' negligent and tortious conduct was the direct and proximate cause of Adam Hendelson's death.

102.  If death had not ensued, Adam Hendelson would have been entitled to maintain a cause of action and recover damages against Defendants because of the above alleged negligent and tortious conduct.

103.  As a direct, foreseeable and proximate result of Defendants' conduct, Decedent's estate has incurred medical and funeral expenses and has been deprived of prospective net accumulations and loss of earnings.

104.  Pursuant to Section 768.21, Florida Statutes, the list of all beneficiaries of the Estate of Adam Hendelson including the following person(s): Lee Hendelson, as sole beneficiary under the Last Will and Testament of Adam Hendelson.

WHEREFORE, Plaintiff, Lee Hendelson, as Personal Representative of the Estate of Adam Hendelson, demands judgment for compensatory damages in an amount to be determined by a jury, including but not limited to those damages provided pursuant to Section 768.21, Florida Statutes, being:

22

a.  The value of lost support and services from the date of the Plaintiff's injury to his death, with interest, and future loss of support and services from the date of death and reduced to present value;

b.  Medical or funeral expenses due to the Decedent's injury or death may be recovered;

c.  Loss of earnings of the deceased from the date of injury to the date of death, less lost support of survivors excluding contributions in kind, with interest; loss of the prospective net accumulations of an estate, which might reasonably have been expected but for the wrongful death; and

d..  Medical or funeral expenses due to the decedent's injury or death that have become a charge against Adam Hendelson's estate.

## COUNT EIGHT – WILFULL CONDUCT & PUNITIVE DAMAGES

105.  Plaintiff adopts and realleges the foregoing paragraphs of this complaint as if fully set forth herein.

106.  At all times material, Defendant's Johnson & Johnson, Janssen and ALZA acted willfully, maliciously and/or with reckless disregard for the safety of ultimate consumers of Duragesic Patches including Adam Hendelson.

107.  The conduct of these Defendants, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of Adam Hendelson and the users and ultimate consumers of this product and as such Plaintiff is entitled to and hereby claims Punitive Damages in this action.

WHEREFORE, Plaintiff demands judgment against Defendants Johnson & Johnson, Janssen and ALZA for compensatory and punitive damages in an

amount to be determined by a jury and demands trial by jury of all issues triable as of right by a jury.

## PRAYER FOR RELIEF

As a proximate, direct and legal result of Defendants' negligent, willful, wanton, malicious and/or oppressive behavior, Plaintiff, Lee Hendelson, individually and as Personal Representative of the Estate of Adam Hendelson, seeks judgment and relief from Defendants including but not limited to the following:

    a.    Compensatory damages as allowed by law;

    b.    Punitive and exemplary damages as allowed by law;

    c.    Incidental and consequential damages as allowed by law;

    d.    Attorneys fees and costs as allowed by law;

    e.    That Summons be caused to issue to all Defendants to Answer this Complaint; and

    f.    Any other relief to which the Court finds Plaintiff is entitled.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable in this civil action.

Dated: December 13, 2005

Respectfully submitted,

Bryan F. Aylstock, Esq.
Douglass A. Kreis, Esq.
*Aylstock, Witkin & Sasser, PLC*
4400 Bayou Blvd., Suite 58
Pensacola, FL 32503
(850) 916-7450 Phone
(850) 916-7449 Fax

Joe R. Whatley, Jr., Esq.
W. Todd Harvey, Esq.
Andrew C. Allen, Esq.
*Whatley Drake, LLC*
2323 Second Avenue North
Birmingham, Alabama 35203
(205) 328-9576 Phone
(205) 328-9669 Fax

Ike Gulas, Esq., Esq.
Jason Stuckey, Esq.
Edward E. Angwin, Esq.
*Gulas & Stuckey, P.C.*
2031 Second Avenue North
Birmingham, AL 35209
(205) 879-1234 Phone
(205) 879-1247 Facsimile

**COUNSEL FOR PLAINTIFF**

JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Lee Hendelson, individually and as Personal Representative for the Estate of Adam Hendelson,

## DEFENDANTS

Johnson & Johnson Company; Janssen Pharmaceutica Products, LP; & Alza Corporation

**(b)** County of Residence of First Listed Plaintiff   Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Douglass A. Kreis                     850-916-7450
Aylstock, Witkin & Sasser, PLC
4400 Bayou Blvd., Suite 58
Pensacola, FL 32503

Attorneys (If Known)

05-81116

05CV 81116

FILED 2005 DEC 15 PM 9:
CLERK US DIST CT
S.D. OF FLA - W.P.B.

**(d)** Check County Where Action Arose: ☐ DADE  ☐ MONROE  ☐ BROWARD  ☒ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government Plaintiff
☐ 3   Federal Question (U.S. Government Not a Party)
☐ 2   U.S. Government Defendant
☒ 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff

(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

MAGISTRATE JUDGE
JOHNSON

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

Appeal to District Judge from Magistrate Judgment

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 U.S.C. 1332

LENGTH OF TRIAL via   7   days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE                     DOCKET NUMBER

DATE
12-13-05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              APPLYING IFP