IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 05-81116 CIV-HURLEY
MAGISTRATE HOPKINS

LEE HENDELSON, individually and as )
Personal Representative for the Estate of )
ADAM HENDELSON, )
)
      Plaintiff, )
)
v. )
)
JOHNSON & JOHNSON COMPANY, )
JANSSEN PHARMACEUTICA PRODUCTS, )
L.P., and ALZA CORPORATION )
)
      Defendants. )
)

## DEFENDANTS' RENEWED MOTION FOR ENTRY OF JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, FOR A NEW TRIAL

In response to the entry of judgment, Defendants Janssen Pharmaceutica Products, L.P. and ALZA Corporation hereby renew their previous motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). In the alternative, Defendants seek a new trial pursuant to Federal Rule of Civil Procedure 59. "Where alternative motions for judgment as a matter of law and for new trial are presented, the court should rule first on the motion for judgment, and whatever his ruling thereon he should also rule on the motion for a new trial, indicating the grounds of his decision." *Johnson v. Clark*, 484 F.Supp.2d 1242, 1246 (M.D.Fla., 2007) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 253 (1940)).

**I.    Renewed Motion for Judgment as a Matter of Law**

"[T]he entry of judgment as a matter of law is appropriate if the [plaintiff] failed to make a showing on an essential element of his case with respect to which he had the burden of proof." *Pulte Home Corp. v. Osmose Wood Preserving, Inc.*, 60 F.3d 734, 739 (11th Cir., 1995). "[A]

1

mere scintilla of evidence does not create a jury question. Motions for judgment as a matter of law...need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather, there must be a substantial conflict in evidence to support a jury question." *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir., 2002) (citation and alteration omitted).

The Eleventh Circuit recently emphasized, "[I]n deciding on a Rule 50 motion a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence. The question before the district court regarding a motion for judgment as a matter of law remains whether the evidence is legally sufficient to find for the party on that issue....[I]n ruling on a party's renewed motion under Rule 50(b) after the jury has rendered a verdict, a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence." *Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1227 (11th Cir., 2007). "The jury's findings should be excluded from the decision-making calculus on a Rule 50(b) motion, other than to ask whether there was sufficient evidence, as a legal matter, from which a reasonable jury could find for the party who prevailed at trial." *Id.* at 1228.

"[I]n order to survive a defendant's motion for judgment as a matter of law....the plaintiff must present evidence that would permit a reasonable jury to find in the plaintiff's favor on *each and every element* of the claim." *Bogle v. Orange County Bd. of County Com'rs*, 162 F.3d 653, 659 (11th Cir., 1998) (emphasis added). "A district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir., 2005). In determining a post-verdict Rule 50(b) motion, "[a] jury verdict is not entitled to the benefit of unreasonable inferences, or those at war with the

undisputed facts." *Johnson v. Clark*, 484 F.Supp.2d 1242, 1246 (M.D.Fla., 2007) (citing *United Fire & Cas. Ins. Co. v. Garvey*, 419 F.3d 743, 746 (8th Cir.2005)).

    A.    **Defendants are entitled to judgment as a matter of law on Plaintiff's manufacturing defect claims because Plaintiff failed to present sufficient evidence to establish that the product at issue had a manufacturing defect.**

Defendants first move for Judgment as a Matter of Law as to the manufacturing defect claims covered by Questions 1(a) of the jury verdict form. As the Court is aware, Plaintiff alleged that the Duragesic patch used by Adam Hendelson malfunctioned – leaked – because it had some sort of manufacturing defect that resulted in an incomplete seal around the fentanyl gel reservoir of the patch. Plaintiff, however, presented no expert testimony that the patch in this case was defective in any way; his entire manufacturing defect claim is based upon the *Cassisi* inference. *Cassisi v. Maytag Co.*, 396 So.2d 1140, 1143 (Dist.Ct.App.Fla. 1981).

Under *Cassisi,* the jury may infer the product in question is defective at both the time of injury and the time of sale if it (1) malfunctions, (2) during normal operation. There was insufficient proof of a malfunction – a leak in the patch – to warrant invoking the inference of a manufacturing defect – an incomplete seal around the Duragesic gel. Without that inference, there is no proof of defect. This is not a case where the product was missing; the patch was examined by expert witnesses on both sides. The un-contradicted testimony is that there was no observable defect in the patch. Dr. Prausnitz testified in the abstract that one 75 mcg patch would not deliver a 9.4 nanogram level of fentanyl without a malfunction. Trial Tr. p. 544. Dr. Middleberg offered a similar opinion. Trial Tr. P. 331. They did not offer an opinion about a malfunction in the patch being worn by Mr. Hendelson, and as such the *Cassisi* inference should not have been invoked.

By contrast, in *Nelson v. Freightliner*, 154 Fed.Appx. 98 (11th Cir. 2005), there was clear evidence of a product malfunction during normal use. The undisputed evidence was that Mr.

3

Nelson, a truck driver, was operating his truck in a normal manner and a diesel truck is designed to prevent carbon monoxide and other gases from leaking into the cab of the truck. He had a very high level of carbon monoxide in his blood and there was specific testimony that the "decomposition of the blood sample would not inflate the carboxy hemogolbine quantification by a statistically significant amount." *Id.* at 111. The inference of a defect in that situation was compelling; it "arises from the occurrence of the accident itself." *Cassisi*, 396 So.2d at 1148. Here, however, the facts give rise to no such inference. We know that the 9.4 nanogram level of fentanyl was not necessarily present at the time of death (there was abundant testimony about post-mortem redistribution)(see, for example, *Middleburg*, p. 362), that the level at death was almost certainly lower than 9.4 and by admission of Plaintiff's experts – conceivably within the therapeutic range because some individuals tolerate fentanyl and without being adversely affected by a 9.4 level. (Trial Testimony of Robert Middleburg at pp. 358 & 359.) In addition, there were patches not accounted for and there were other drugs which were in Mr. Hendelson's system which by all experts' agreement made some contribution to his death. On the specific facts of this case, there is insufficient evidence to support any finding of an inference of defect. Without that inference, there is no proof of a manufacturing defect.

### B. Negligent Manufacturing Claim.

For all the reasons stated in the prior section, Defendants are entitled to judgment under Rule 50 as to the claims of negligent manufacturing reflected in the answer to question 2(a).

### C. Defendants are entitled to judgment as a matter of law for each of Plaintiff's causes of action because there was insufficient evidence of proximate cause.

There was also insufficient evidence of proximate cause between any defect or negligence and the death of Adam Hendelson. Part of Plaintiff's *prima facie* case is to prove proximate cause – that some defect in the product caused or substantially contributed to Adam

4

Hendelson's death. "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the Court to direct a verdict for the defendant." *Reaves v. Armstrong World Indus., Inc.*, 569 So.2d 1307, 1309 (Fla. 4th DCA, 1990).

It is undisputed that the *Cassisi* inference does not apply to causation. *Rink v. Cheminova, Inc.*, 400 F.3d 1286 (11th Cir., 2005). Nor does the fact that Mr. Hendelson had a 9.4 fentanyl level many hours after death prove that he died as a result of a defect in a patch. Dr. Middleberg admitted this when he said no toxicologist could express an opinion about the source of the fentanyl in Mr. Hendelson. Page 357, lines 8-11. No direct testimony was offered on proximate cause. So Plaintiff's proximate cause proof was left to a stacking of inferences. That is not permissible. *Commercial Credit Corporation v. Varn*, 108 So.2d 638 (Fla.1959). In *Varn*, there was an unexplained slip and fall. The Court applied the rule against stacking inferences as follows:

> In order to arrive at a conclusion that the appellant was responsible in damages for the ultimate injury, the jury would have to infer in the first place that under all of the circumstances there was negligence on the part of the defendant in the maintenance of its floor. On top of this inference it would have to infer that such negligence in maintenance produced a dangerous condition of the floor which in turn existed at the time the appellee walked over it and then the ultimate final inference that such inferred dangerous condition was the proximate cause of the appellee's skidding. It certainly cannot be concluded from this record that the initial inference, to wit, the alleged dangerous condition of the floor, was justified to the exclusion of all other reasonable inferences. This being so, it becomes obvious that the ultimate conclusion of the jury would have to be founded on inferences based upon inferences. Under the rules of the cited cases this cannot be done.

*Varn, supra*, 108 So.2d 638, 640-41.

Here the stacking of inferences to establish causation is even more tortured. Even assuming the *Cassisi* inference was properly invoked on the defect issue, the following

5

inferences would be necessary to establish causation: that Duragesic gel escaped a malfunctioning patch (there can be malfunctions without gel escape); that gel got on the skin (even if gel gets out of the patch it does not necessarily reach the skin – it could stay on top of the patch or be dissolved by clothing); that it was able to penetrate the skin before evaporation took place; that there were no use of other patches used within a few days of death; and that post-mortem redistribution did not account for the 9.4 fentanyl level found many hours after death. Plaintiff is not entitled to heap inference upon inference, which is the only thing that supports the jury verdict in this case. In *Girdley Const. Co. v. Ohmstede*, 465 So.2d 594, 595-96 (Fla.App.1 Dist., 1985), for example, a finding by a hearing examiner that decedent sustained an accident arising out of and in the course of his employment was reversed. A deputy commissioner relied initially upon an inference that the accident caused the subdural hematoma, upon a further inference that the subdural hematoma led to some physical and mental impairment, and upon the still further inference that the physical and mental impairment caused the decedent to walk in front of the truck some three days later. This was held to be impermissible.

    There is an even more fundamental problem with insufficiency of proof of causation here. It is well-established Florida law that an inference upon an inference may not be relied on to establish an essential fact unless the original inference can be elevated to the dignity of an established fact because of the absence of any reasonable inference to the contrary. In *Voelker v. Combine Insurance Company of America,* 73 So.2d 403 (Fla.1954), Mr. Voelker died in an un-witnessed automobile accident, so it was not determinable whether the accident itself killed him or whether he might have died from medical problems that preceded the accident. The Court concluded that there was a reasonable inference that Mr. Voelker experienced an accident while driving his automobile but that he was not entitled to recovery under the insurance policies at

6

issue unless the inference that he received bodily injury while actually driving or riding in his automobile was the only reasonable inference that could be drawn from the prior inference that he met with an accident. He was entitled to this inference only if he could exclude all other reasonable theories, and the Court concluded that he could not.

Similarly in this case, even assuming the validity of the *Cassisi* inference – that there was a malfunction in the Duragesic patch and therefore a manufacturing defect in it – Plaintiff still has to establish causation. The only evidence Plaintiff points to, however, is a 9.4 nanogram reading taken many hours after death. In this case there is evidence that 9.4 is not necessarily fatal, because of post-mortem redistribution and drug interactions. All of these are other reasonable inferences that point away from causation, and they were not excluded by Plaintiff. Based on *Voelker*, Defendant's Rule 50 Motion should be granted.

### D. Defendants are entitled to judgment as a matter of law because there was insufficient evidence that the warnings were defective, and there was insufficient evidence of a causal connection between the warnings and Adam Hendelson's death.

The jury also found for Plaintiff on a failure to warn claim. See Questions 1(c) and 2(c) of the verdict form. Defendants' Motion under Rule 50 should be granted based upon insufficient evidence. There must be "sufficient evidence of the inadequacy of the drug warnings to submit [a] case to the jury." *Upjohn Co. v. MacMurdo*, 562 So.2d 680, 682 (Fla.,1990). Here, such evidence was not presented.

First, there was no expert testimony to establish any warning defect in the package insert regarding "leaking patches." Nor was there expert testimony that the failure to include a different warning was negligent. Expert testimony is required to establish such defect and negligence. *Upjohn Co. v. MacMurdo*, 562 S.2d 680, 683 (Fla.,1990) ("In this case, no medical expert testified that the package insert was insufficient....The evidence was insufficient to present

7

a jury question on the inadequacy of the package insert to warn of the potential consequences of the use of the drug.") In *Paparo v. Ortho McNeil Pharmaceutical,* 2007 WL 121149, 4 (S.D.Fla.,2007), Judge Ryskamp held that the defendant was entitled to summary judgment because the plaintiff had failed to present an expert to support her failure to warn claim. "[B]ecause a manufacturer's duty to warn of a drug's hazard runs to the physician, the adequacy or inadequacy of the manufacturer's warning to inform a physician must also be proved by expert testimony." *Id.,* citing *Haggerty v. The Upjohn Co.,* 950 F.Supp. 1160, 1168 (S.D.Fla.1996). Furthermore, even if a warning is given to a patient, expert testimony is still necessary. A complex pharmaceutical drug is still being warned about. See *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir. 1974) (applying exception for vaccination clinics in which there is no true learned intermediary, but still noting medicines involved are "complex medicine, esoteric in formula and varied in effect").

Furthermore, even assuming that Defendants' duty to warn extended to the patient rather than just the prescribing physician,[1] Plaintiff failed to present any evidence that a failure to warn was a cause of Adam Hendelson's death. To establish a causal connection, Plaintiff must present evidence "to show how any warning from [Defendants] could have prevented or ameliorated the injuries that occurred." *American Motors Corp. v. Ellis,* 403 So.2d 459 (Fla. 5th DCA, 1981), quoted in *Edic ex rel. Edic v. Century Products Co.,* 364 F.3d 1276, 1280 (11th Cir., 2004). Plaintiff, however, failed to present any evidence that Adam Hendelson would have read the warnings about leaky patches had Defendants provided one, and that he would have altered his use of Duragesic accordingly. The Court's statement in *Ellis* also rings true here: "Only if we were to engage in the speculation that the [consumer], properly warned, would not have [used the product], could we recognize a causal relationship between breach of a duty to warn and the

8

instant injury." *Ellis, supra,* 403 So.2d 459, 467. Without the required evidence to support a causal connection, the determination of whether a failure to warn caused Adam Hendelson's death is pure speculation.

### E. Summary of Rule 50 Arguments.

"[I]n ruling on a party's renewed motion under Rule 50(b) after the jury has rendered a verdict, a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence." *Chaney v. City of Orlando, Fla.,* 483 F.3d 1221, 1227 (11th Cir., 2007). Here, Defendants are entitled to judgment as a matter of law because Plaintiff failed to meet his burden to show that (1) there was a defect in the Duragesic patch used by Adam Hendelson, (2) such a defect was the cause of his death, (3) the warnings for Duragesic were insufficient, and (4) any deficiency in the warnings caused his death. Judgment should therefore be entered in favor of Defendants.

## II. Motion for a New Trial

In the event the Court denies Defendants' renewed motion for judgment as a matter of law, it should order a new trial. "[G]ranting motions for new trial touches on the trial court's traditional equity power to prevent injustice and the trial judge's duty to guard the integrity and fairness of the proceedings before him."[1] *Christopher v. Florida,* 449 F.3d 1360, 1366 n.4 (11th Cir., 2006). "A new trial may be granted to all or any of the parties and on all or part of the issues...for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. Proc. 59. "Although a comprehensive list of the grounds for granting a new trial is elusive, the Supreme Court has held that a motion for a new trial may rest on the fact that the verdict is against the weight of the evidence, that damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise

---

[1] Defendants submit that such a duty does not exist under Florida law. See section II(D) below.

questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Johnson v. Clark*, 484 F.Supp.2d 1242, 1246 (M.D.Fla., 2007) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

In this case, a new trial is warranted because the instructions given to the jury were erroneous, the jury's verdict was against the great weight of the evidence, and the damages awarded were excessive.

### A. The jury instruction regarding inference of defect was erroneous because the *Cassisi* inference is not applicable to complex pharmaceutical cases.

The *Cassisi* inference is not applicable in cases involving pharmaceutical products because they are too complicated for the application of the principle. *Cassisi* has been applied in a variety of products liability cases, but those cases are far more straightforward than the issues presented here. Indeed, the *Cassisi* court likened the inference to the doctrine of *res ipsa loquitur*, saying that "[b]oth legal inferences are similar since they are based upon common sense assumptions." *Cassisi v. Maytag Co.*, 396 So.2d 1140, 1149 (Fla.App., 1981). The issues presented in this case are hardly "common sense"; to the contrary, they involve products that are inherently unsafe if used incorrectly, and thus cannot be obtained without a physician's prescription. In order for the inference to apply, a plaintiff needs only to show that the product malfunctioned in the course of normal operation. However, "malfunction" and "normal operation" have little meaning in the area of complex drug interactions, particularly in a death case where postmortem redistribution comes into play.

The application of the *Cassisi* inference is not warranted in this case, which involves medical issues, drug interactions, and unavoidably unsafe products. The instruction to the jury allowing an inference of a defect was erroneous, and warrants a new trial.

### B.     The jury instruction regarding inference of defect was erroneous because Plaintiff had not established the prerequisites required for *Cassisi* to apply.

Even assuming the *Cassisi* inference could be applied to a complex case such as this one, the jury instructions did not accurately reflect Florida law. Jury instructions must fairly and adequately address the issues and correctly state the law. *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1190-91 (11th Cir.1995). If the jury instructions in a case do not accurately reflect the law and the instructions as a whole do not correctly instruct the jury, a new trial must be granted. *S.E.C. v. Yun*, 327 F.3d 1263, 1281 n.39 (11th Cir., 2003). Here, there was not sufficient evidence of malfunction to warrant giving the instructions.

The *Cassisi* inference does not apply in every products liability case. "[T]he facts essential for the inference's application are simply proof of the malfunction during normal operation." *Cassisi v. Maytag Co.*, 396 So.2d 1140, 1151. These two facts are considered "prerequisites" or "predicate facts" that must be established before the *Cassisi* inference can be relied upon by a plaintiff. See, e.g., *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1259 (11th Cir., 2002); *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 684 (11th Cir., 1984); *Humphreys v. General Motors Corp.*, 839 F.Supp. 822, 828 (N.D.Fla., 1993); *Jones v. Heil Co.*, 566 So.2d 565, 567 (Fla. 1st DCA, 1990). Without evidence that these two factors exist, the *Cassisi* inference is not applicable.

Here, Plaintiff presented no evidence whatsoever of a malfunction. The malfunction Plaintiff alleged was a leak in the patch, which would have allowed for an inference that there was a manufacturing defect in the patch's seal. Plaintiff presented no evidence of a leak, Plaintiff suggested a malfunction because the 9.4 post-mortem level but there was no dispute about the existence of post-mortem redistribution, that some individuals would be tolerant to this level and that it was possible the fentanyl level before death was in a therapeutic range. Without

11

any evidence that the patch actually malfunctioned, Plaintiff's case rested on speculation alone; an inference of a defect that rested upon on an inference of malfunction.

An instruction allowing the jury to speculate about whether the patch leaked and therefore whether there was an inference of a defect was entirely improper. Without evidence of the predicate facts, the jury should not have been instructed regarding an inference of defect based on *Cassisi*. Because this instruction to the jury misstated Florida law, a new trial is warranted under Rule 59.

### C. The verdict was against the weight of the evidence.

"The trial court may grant a motion for a new trial under Rule 59 if it believes the verdict rendered by the jury was contrary to the great – and not merely the greater – weight of the evidence." *Williams v. City of Valdosta,* 689 F.2d 964, 973 n. 7 (11th Cir.1982). "A judge should grant a motion for a new trial when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence [that] would prevent the direction of a verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.,* 267 F.3d 1183, 1186 (11th Cir., 2001).

"In order to determine whether the jury verdict in the first trial was against the great weight of the evidence, we must first consider what the plaintiff was required to prove." *Hardin v. Hayes,* 52 F.3d 934, 938 (11th Cir., 1995). As in any products liability case, Plaintiff had the burden to prove that there was a defect in the product, and that the defect caused Adam Hendelson's death.

As discussed more fully above, Plaintiff failed to present sufficient evidence to prove either of these two critical elements. First, there was no evidence to show that there was a defect in the patch, and there was insufficient evidence to warrant use of the *Cassisi* inference to prove

12

defect. Furthermore, there was no evidence to establish a causal connection between any defect and Adam Hendelson's death.

But even assuming that there was sufficient evidence to prove a malfunction, the jury's conclusion that there was such a manufacturing defect was against the clear weight of the evidence. It is undisputed that there were no observed defects in the patch. There was also no dispute about the existence of post-mortem redistribution or that such phenomenon took place with fentanyl. It was undisputed that due to tolerance some patients wearing a 75 mcg patch would have fentanyl levels in the 9.4 range. And Plaintiff's experts conceded that Adam Hendelson's fentanyl level could have been at a therapeutic level at the time of death. Add to that the fact that there were two patches used from the box of 75 mcg patches and the fact that the 25 mcg patches were not accounted for and it is clear that the finding of a defect was against the weight of the evidence.

The jury's finding that a manufacturing defect was the legal cause of death is also against the weight of the evidence. As discussed in section 1(c) above the stacking of inferences is not sufficient to support a jury verdict but have the causation finding is also against the weight of the evidence. Dr. Prausnitz admitted that much of the fentanyl in the patch was in suspension – not solution. He further admitted that if gel got on the skin that the fentanyl in suspension would not penetrate the skin. And he admitted that the fentanyl which was in solution (ethanol and water) would be impacted by the evaporation of the ethanol and water. Dr. Levy testified that evaporation would happen more rapidly than the drug could penetrate the skin depot. Dr. Prausnitz did not directly refute that. He could not estimate the time by which evaporation would take place. The clear weight of the evidence was that there would be no substantial increase in fentanyl levels – even assuming gel got on the skin through a defect of some kind.

13

### D. The jury instruction regarding warnings misstated Florida law and imposed a duty that does not exist.

The instructions to the jury regarding failure to warn Adam Hendelson did not accurately reflect Defendants' duties under Florida law. Established Florida law holds that a "manufacturer's duty to warn of drug hazards runs to the physician, not directly to the patient." *Christopher v. Cutter Laboratories*, 53 F.3d 1184, 1192 (11th Cir., 1995) (emphasis added); *see also Buckner v. Allergan Pharmaceuticals, Inc.*, 400 So.2d 820 (Fla. 5th DCA 1981); *Upjohn Co. v. MacMurdo*, 562 So.2d 680, 683 (Fla., 1990); *E.R. Squibb and Sons, Inc. v. Farnes*, 697 So.2d 825, 827 (Fla.,1997); *Felix v. Hoffman-Laroche, Inc.*, 540 So.2d 102, 104 (Fla.1989).

Rather than follow Florida law, the jury instruction in this case followed a proposal set out in the Restatement (Third) of Torts, Section 6(d)(2). That section of the Restatement says, "A prescription drug or medical device is not reasonably safe due to inadequate instructions or warnings if reasonable instructions or warnings regarding foreseeable risks of harm are not provided to...the patient when the manufacturer knows or has reason to know that health-care providers will not be in a position to reduce the risks of harm in accordance with the instructions or warnings." No Florida court, however, has adopted this subsection. See *McConnell v. Union Carbide Corp.*, 937 So.2d 148, 151 n.4 (Fla. 4th DCA 2006) (holding that the Restatement (Third) has not been adopted in strict liability cases in Florida); *Force v. Ford Motor Co.*, 879 So.2d 103, 107 (Fla. 5th DCA 2004) (same). Furthermore, the comments of the Restatement itself reveal that the facts of this case do not fit the situation for which this standard was intended. See Restatement (Third) of Torts, Section 6, comments b and e (providing examples of situations in which the prescribing physician has a diminished role as a decision maker such that

14

a warning directly to the patient may be warranted). None of the situations suggested in the Restatement is present in this case.[2]

The error regarding this jury instruction was further compounded by the manner in which the instruction was given to the jury, which essentially directed a verdict for Plaintiff. The Court never instructed the jury to make a fact determination as to whether Adam Hendelson and Dr. Tannanbaum were in a situation in which Dr. Tannanbaum had "a much-diminished role as an evaluator or decisionmaker." Rather, the Court simply informed the jury that "in this instance the prescribing doctor is not in a superior position to reduce the risks of harm associated with the product..." (Transcript of Proceedings, June 18, p. 1812.) The jury was therefore instructed improperly regarding the duty itself, and Defendants were deprived of the right to have the jury make the fact determination of whether such a relationship was present.

The jury instruction regarding warning the patient was therefore improper because it (1) misstated Florida law, (2) imposed a duty that doesn't exist under Florida law, and (3) took an essential fact question out of the jury's hands. A new trial is warranted to remedy this error of law.

### E.     The net accumulations award was speculative and excessive.

"A new trial is appropriate when a verdict awards damages contrary to the manifest weight of the evidence." *Perlman v. Valdes*, 575 So.2d 216, 218 (Fla. 3d DCA, 1990). "The court may order a remittitur or new trial if it believes the amount is so great … as to indicate that

---

[2] Here in the Southern District of Florida, Judge Gold recently addressed one of the situations set out in the Restatement in which a patient warning could be warranted – direct-to-consumer advertising. Judge Gold noted that no Florida court – and indeed no court aside from one in New Jersey – has held that a prescription drug manufacturer has a duty to warn patients directly, even when the manufacturer has marketed a drug or medical device directly to the patient. Judge Gold declined to carve out an exception to the learned intermediary doctrine based on established Florida case law: "Given Florida's longstanding recognition of the learned intermediary doctrine, I conclude that it would be unlikely that the Florida Supreme Court would recognize the [direct-to-consumer] exception." *Beale v. Biomet, Inc.*, 2007 WL 1836696, *14 (S.D.Fla.,2007).

the jury must have found it while under the influence of passion, prejudice or gross mistake." *Glabman v. De La Cruz*, 954 So.2d 60, 62 (Fla. 3d DCA, 2007).

Only passion, prejudice or gross mistake could have motivated this jury to award $500,000 in net accumulations in this case – for there was no evidence to support such an award. Adam Hendelson had zero savings. Yet it is a decedent's propensity to save that gives rise to recovery for net accumulations. *Citrus County v. McQuillin*, 840 So.2d 343, 346-47 (Fla.5th DCA, 2003). The estate of someone who doesn't save, cannot acculate a thing.

In *Citrus County*, the jury awarded a widower $50,400 in net accumulations after the death of his 28-year-old wife. *Id.* The court reversed the award and stated: "Because the parties had no record of saving anything by the time of the accident and no evidence was presented that the decedent had any propensity to save in the future, or ability to do so, the award of net accumulations is speculative and based on insufficient or no evidence." *Id.* at 346.

In this case not only did Adam Hendelson have no savings, he had no income and couldn't even support himself. He relied on financial assistance from his father to meet his living expenses. The evidence indicates that Adam Hendelson's medical and psychological condition, rendered it difficult to impossible for him to hold a job. There is no competent, substantial evidence that Adam Hendelson would have turned the life that he lived for years prior to his death, completely around. There is no proof that he would have become gainfully employed, and would have accumulated savings.

Given the facts of this case, a net accumulations award is completely inappropriate, Like in *Citrus County*, the award of net accumulations in this case warrants a new trial on Plaintiff's net accumulations claim.

F.  **The pain and suffering damages were excessive and based on highly emotional and prejudicial trial testimony and argument.**

The court should also order a remittitur or a new trial on the issue of damages because the award of $5,000,000.00 for emotional damages suffered by Lee Hendelson is so excessive as to indicate that the jury must have made the determination while under the influence of passion and prejudice. This is a decision in which the trial court has wide discretion, but its determination is especially important because "of the unique vantage point which the trial court has to personally observe the witnesses and jury." *Glabman*, 954 So.2d 60, 62 (Fla. Dist. Ct. App. 2007). In this case, the court witnessed multiple instances of emotion-laden testimony and argument—especially during Mr. Hendelson's examination and by Plaintiff's counsel during closing arguments. The exorbitant award stands as its own evidence that these arguments had their intended effect: to persuade the jury to rely on their passion and sympathy with the defendant when calculating compensatory damages.

The trial judge should order a remittitur or a new trial when, as in this case, the damages awarded are "so great . . . as to indicate that the jury must have found it while under the influence of passion, prejudice, or gross mistake." *Id.* (citing *Lassiter v. Int'l Union of Operating Engineers*, 349 So.2d 622 (Fla. 1977)). Florida courts are attentive to the likelihood of emotion prompting excessively high awards to parents in cases resulting in the death of a child. One court reversed an award for pain and suffering by recognizing that the excessive award could only be explained by the father's emotional testimony in which he, as well as several jurors, cried. *Glabman*, 954 So.2d at 63 ("[W]e are compelled to reverse the jury verdict on damages as they are so excessive that they could only have been a product of passion and emotion based on [the father's] emotional testimony rather than the result of the record presented.").

17

Florida courts have reversed jury verdicts for being inappropriately based on sympathy and emotion in cases with far lower damages than the $5,000,000 awarded in this case. *See, e.g., Harbor Ins. Co. v. Miller*, 487 So.2d 46 (Fla. Dist. Ct. App. 1986) (reversing a $1,560,000 verdict to the family of a deceased minor); *Russell, Inc. v. Trento*, 445 So.2d 390 (Fla. Dist. Ct. App. 1984) (reversing a $1,125,000 verdict to a mother for the death of her son because an "emotional breakdown" by plaintiff's counsel improperly influenced the jury's damage award). Indeed, the *Russell* case suggests even more reason to be skeptical of the size of the jury's award to the extent that it observed the particularly pervasive influence of emotional closing arguments. *Russell*, 445 So.2d at 392 ("The purpose of closing argument is for counsel to discuss with the jury their versions of the evidence and the reasonable inferences therefrom, in light of the issues framed by the pleadings. Remarks made solely for the purpose of evoking sympathy for the plaintiff and of such a character that neither rebuke nor retraction will destroy their prejudicial, sinister influence warrant a new trial.").

Because the $5 million award was likely based on emotion, a new trial or remittitur is warranted to remedy this error.

DATED: July 9, 2007

**ADORNO & YOSS LLP**

By: /s/ M. Vargas
ANTHONY N. UPSHAW
anu@adorno.com
Florida Bar No.: 861091
Michele A. Vargas
mvargas@adorno.com
Florida Bar No.: 686395
2525 Ponce de Leon Blvd., Suite 400
Coral Gables, Florida 33134
Phone: (305) 460-1052
Fax: (305) 460-1422

TUCKER ELLIS & WEST LLP
MICHAEL C. ZELLERS
RICHARD DEAN
ERNEST AUCIELLO
1150 Huntington Building
925 Euclid Avenue
Cleveland, OH 44115
Telephone: (216) 592-5000
Facsimile: (216) 592-5009

Attorneys for Defendants
JOHNSON & JOHNSON
JANSSEN PHARMACEUTICAL INC., and
ALZA CORPORATION

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed and sent via U.S. Mail this 9th day of July, 2007 to:

Edward E. Angwin, Esq.
Jason A. Stuckey, Esq.
GULAS & STUCKEY P.C.
2031 2nd Avenue North
Birmingham, AL 35203
(205) 879-1234
(205) 879-1247

Counsel for Plaintiff

*/s/ M. Langes*
One of the Attorneys for Defendants
JOHNSON & JOHNSON
JANSSEN PHARMACEUTICAL INC., and
ALZA CORPORATION

20

imanage/ 30180/ 00159/ 948981/ 1/